## THE OBDAM.

### NETHERLANDS AM. STEAM NAV. CO. v. NEGRE et al.

(Circuit Court of Appeals, Second Circuit. March 13, 1894.)

#### No. 71.

COLLISION—SAILING VESSEL AT ANCHOR—FOG SIGNALS.

A fishing bark anchored in a fog was about to change her position, when she was run into and cut in two by a steamer going at an excessive speed. At the time the bark's crew were engaged at the windlass, but there was a conflict of evidence whether the anchor had yet left the ground. The bark, at any rate, had not yet gathered headway. Her bell had been kept ringing until collision, and the fog horn had not yet been sounded, though it was in readiness for use. *Held* that, even if the anchor had left the ground, the failure to change the fog signal from bell to fog horn was not a fault contributing to the collision.

Appeal from a decree of the District Court, Eastern District of New York, in favor of the owners of the French fishing bark Christophe Colomb, for the recovery of $27,794.50, collision damages, against the steamship Obdam.

The material facts are stated in the opinion of this court, infra. The conclusions of the district court were announced in the following opinion by Judge BENEDICT:

My conclusion in this case is that the collision in question must be held to have been caused by the fault of the steamer in maintaining a rate of speed which was unlawful under the circumstances, and was not caused by fault on the part of the bark. Let a decree be entered in favor of the libelants, with an order of reference to ascertain the amount of the damages.

Harrington Putnam, for appellant.
Wm. W. Goodrich, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. About 1:15 p. m. on July 27, 1890, the steamship Obdam came into collision with the bark upon the Grand Banks of Newfoundland. The weather was foggy, and the steamer was proceeding, as her officers admit, at a speed of from six to seven knots an hour. Other testimony in the case would make her speed much higher, but further discussion of that branch of the case is unnecessary. The district judge held her in fault for maintaining a rate of speed which was unlawful under the circumstances, and upon this appeal the claimant does not question the soundness of that finding. The district judge further found that the collision was not caused by fault on the part of the bark. His opinion does not refer in detail to the several faults charged against her upon conflicting testimony, but his conclusion indicates that he found none of them to be established by the proof. The principal—practically the only—fault charged against the bark is a failure to give proper fog signals. Both vessels sighted each other when about one length of the steamer apart, at which time the whistle of the steamer was first heard by the Colomb. Up to the time of sighting, no signal had been heard from the Colomb by those on the Obdam. Thereafter several short blasts of her fog horn were heard.

On the part of the bark, which had anchored there the afternoon before, it is contended that her bell was sounded, while the fog lasted,—certainly since noon, and down to the moment of collision, —at intervals of one and a half to two minutes. The testimony from the bark in support of this statement is overwhelming. Every survivor of her officers and crew, 21 in all, testify positively and unhesitatingly that the bell was so rung by one Tauvel, who had no other duty assigned to him at the time, who continued attending to the bell when all the rest of the crew were busy with the anchor or the sails, and who was killed at his post. In opposition, there is only the negative evidence of those on the Obdam, who did not hear the bell,—a circumstance which might be accounted for in part by the fog, in part by synchronism between the bell and her own whistle, coupled with a high rate of speed. There is evidence tending to show that she was going much faster than six knots. She cut the bark in two pieces, and ran through her from eight to ten fathoms. The appellant lays great stress on a statement as to the ringing of the bell, which is contained in the Rapport de Mer, executed by the master, mate, boatswain, and several of the crew before the French consul at New York, to which port the survivors were brought by the Obdam. The Rapport was prepared by the master, and left with the consul to be transcribed. No mention of fog signals appeared in it. Calling the next day, with the mate and crew, to hear it read and execute it, the master suggested an addition as to fog signals, which was added in the following language: "After having read the above report, said Capt. Rubatto

adds that he had the bell of his ship sounded at intervals of ten minutes." Thus amended, the Rapport was signed.

The explanation offered by the bark is simple and plausible, viz. that the use of the word "ten" was an error of the consul's secretary, who mistook "deux" for "dix." Capt. Rubatto so testifies, and further swears that on his return to Fecamp, the home port of the bark, he made the declaration required by French law before the commissioner of marine, on which occasion he for the first time learned that the New York protest stated the intervals at 10 minutes. Thereupon he at once insisted that the "consul must have misunderstood him, as he said that he had it rung at two minute intervals." That Capt. Rubatto knew what was the proper interval is not disputed, and there is an inherent improbability in the suggestion that he volunteered the statement that his fog signals were sounded at such long intervals as clearly to indicate fault. In view of the overwhelming, positive, and detailed evidence from the bark as to the actual ringing of the bell, we are not inclined to give any weight to the clause added by the consul's secretary to the original Rapport, although it is signed by master and crew.

It is, however, contended by the appellant, that, even if the bell were rung, as testified to by the witnesses from the bark, that vessel was none the less in fault for failure to give proper fog signals, because the law designates the bell as fog signal for an anchored vessel only, and the Colomb was, as claimant contends, under way on the starboard tack, and should have given single blasts of her fog horn to indicate that fact. It is conceded that the fog horn was not sounded until after the steamer was sighted, and then not so much as a fog signal, but rather to make as much noise as possible. The bark had come to anchor the day before in 37 fathoms of water, with 100 fathoms of chain. About 12 o'clock or a quarter past, being desirous to change the anchorage, the captain gave orders to weigh anchor. This operation requires all hands, and except Tauvel, who remained at the bell, the cabin boy, and two apprentices, all went to the windlass. The wheel was lashed amidships. A small sail aft (the mizzen staysail) had been set to keep her head to the wind. The captain was aft. Near to him on the after part of a skylight lay the fog horn, convenient to be used by him as soon as the vessel got under way. On the Colomb it was customary, when shifting anchorage, to raise the anchor clear up to the hawse pipes,—an operation which, with 100 fathoms of chain out, would take considerably over an hour. After the windlass had been worked for some time, variously estimated at from a half to three-quarters of an hour, orders were given to hoist the jibs. This was done, the work of heaving in the anchor chain being meanwhile suspended. Up to this time there is no substantial dispute in the testimony, which all tends to show that the anchor was still on the bottom. When the jibs were hoisted, the men who had been engaged in that work returned to the windlass, and some of them testify that work thereat was resumed. The weight of evidence, however, is to the contrary, and satisfies us that substantially no further progress was made in raising the anchor, the steamer's

whistle being heard just as the work of heaving began, whereupon all fled aft.

The captain in his Rapport de Mer stated that he "had had the jib and flying jib hoisted, for at last the anchor was breaking ground," and that "there were still about 40 meters of chain under water," which would bring the anchor about 90 feet above the bottom; and on the trial he adhered to this statement, adding; "I think my anchor had left the bottom, but of this I am not certain." Where he was stationed, however, it was impossible for him to know whether or not the anchor had broken ground, in the absence of a report by some one, or some movement of the bark itself which would indicate that she was no longer held by it. No such report was made to him; he had neither sounded the fog horn, nor ordered Tauvel to cease ringing the bell, nor taken the becket off the wheel, when the steamer's whistle was heard. The captain's belief as to the length of chain still out is, in our opinion, of little weight, in comparison with the evidence of those who were at the capstan. The chain was in lengths of 25 fathoms, each length marked with wire. Some of the crew testify that length No. 2 was just coming on the windlass when the Obdam's whistle was heard. This, allowing for the distance to the hawse pipe and the surface of the water, would give about 40 fathoms under water, and the testimony of nearly all the others at the windlass is to the same effect. Undoubtedly, the most satisfactory proof upon this branch of the case is such as shows the depth of water and the length of chain out. There is evidence tending to show that, subsequent to the setting of the jibs, the bark had dropped off somewhat from the wind; but we fail to find satisfactory proof that she had done so sufficiently to put her under headway, or to warrant our discrediting the testimony as to length of chain still out. The yards were braced up on the starboard tack, apparently had been so prior to the attempt to shift anchorage, and the foresail and both topsails were loose and hanging in the gear,—circumstances which probably account for the testimony given by those on board the Obdam to the effect that the sails appeared to be set, and the bark under way on the starboard tack. But the clear preponderance of testimony is to the contrary; and, even if it be conceded that the anchor had ceased holding a few seconds before the Obdam's whistle sounded (an assumption which would account for any change of heading by the bark), it does not follow that the brief delay in changing her fog signal from bell to horn was a fault contributing to the collision. The catastrophe was caused by the conceded fault of the steamer in running at such high speed through a fog as to be unable to stop in time to avoid a vessel advertising her presence by signals at proper intervals. Had she been going at such a rate of speed as would have permitted her to stop or avoid the bark when such signal was heard, there need have been no collision. Nor did the signals given by the bark mislead the steamer, for she did not hear them at all until after she sighted the bark. There is no force in the claim that the bark was in fault for not having a stationed lookout.

Decree of district court affirmed, with interest and costs.